# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 20, 2018

Lyle W. Cayce
Clerk

No. 17-10083

MARTHA ANJELICA ROMERO, Individually and as Representative of Ruben Garcia-Villalpando, Deceased; EDUARDO GARCIA; KEILA GARCIA; ABDIEL GARCIA, Minor; MARIA ESTELA VILLALPANDO; RUBEN GARCIA DIAZ,

　　　　　Plaintiffs - Appellants

v.

CITY OF GRAPEVINE, TEXAS; EDDIE SALAME, Chief of Police; ROBERT CLARK, Officer,

　　　　　Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Plaintiffs, surviving family members of Ruben Garcia-Villalpando ("Villalpando") and the representative of his estate (collectively "Romero"), appeal the district court's grant of a motion to dismiss her claims against the City of Grapevine ("Grapevine") and Eddie Salame, Chief of the Grapevine Police Department ("GPD"). Romero further appeals the district court's subsequent grant of summary judgment in favor of Officer Robert Clark on

No. 17-10083

Romero's remaining excessive force claim under 42 U.S.C. § 1983 on the basis of qualified immunity. For the reasons stated below, we AFFIRM.

## I

On February 20, 2015, shortly after six PM, Officer Clark responded to a burglar alarm at a commercial building. In the driveway adjacent to the back of the building, Clark encountered an idling four-door sedan. The car began to move forward and Clark followed for a short period of time before turning on his emergency lights, signaling for the car to pull over. The sedan, driven by Villalpando, did not stop, proceeded to speed up, and ran a stop sign. Clark activated the full use of his emergency lights and car siren, and began to follow the vehicle. He informed the police dispatcher that he was in pursuit and that he believed the sedan's occupant or occupants were responsible for the "[break] in" at the commercial building. Villalpando continued to accelerate and eventually pulled onto the onramp to State Highway 121, southbound.

Clark began a high speed chase of the sedan on the highway, which, at the time, was heavily trafficked. Villalpando wove the sedan back and forth across the four lanes of traffic and drove around traffic along the shoulders. Clark asked dispatch to alert police units in the neighboring city of Euless. After roughly one-and-a-half minutes of highway pursuit, Villalpando waved one hand out of his driver's side window, apparently signaling that he would pull over. Villalpando proceeded to pull onto the narrow shoulder of a two-lane exit ramp; Clark pulled over behind Villalpando's sedan. Clark testified that because he had followed Villalpando from the scene of a suspected burglary and engaged in a high speed chase in which Villalpando was driving recklessly, he treated the stop as a "felony traffic stop." As Clark explained, "[i]n a felony traffic stop, the Officer will take additional precautions when encountering the stopped vehicle and the precautions can include drawing the Officer's duty weapon," which he did before exiting his vehicle.

2

No. 17-10083

Clark immediately instructed Villalpando: "Let me see your hands. Put your hands out the window." Villalpando complied and waved both hands out of his driver's side window. Clark proceeded to repeat himself several times, instructing Villalpando to "get [his] hands out the window" and "keep [his] hands out the window." During this time frame, Clark testified that Villalpando "repeatedly moved at least one of his hands back out of view inside the vehicle." The dash cam footage shows Villalpando moving his right hand back inside his window at least once. Throughout this time period, several cars passed.

Keeping his left hand raised and visible, Villalpando opened his driver's side door. He then raised both of his hands in the air. Clark immediately ordered Villalpando to "stay right there . . . stay right there and keep your f-cking hands out the window." Villalpando appears to move both of his hands back inside of the car. Clark again repeated his instructions, yelling "get your hands out," "keep your f-cking hands up," and "dude, I'm telling you keep your hands right there." He also radioed the police dispatcher, telling them that Villalpando was trying to get out of the vehicle and requesting that his backup "step it up." Villalpando again briefly moved his right arm back inside his vehicle, after which Clark screamed "hey! Keep your f-cking hands where I can see 'em." Again, several cars drove past the scene developing on the highway shoulder.

Despite Clark's instructions, Villalpando proceeded to open his door, exit his car, and turn towards Clark. He initially kept his arms raised above his head. Clark yelled several more warnings: "you better stand right there motherf-cker," "stay right there," "keep your hands where I can see them and stay right there." Though Clark's exact position at this point is not visible on the film, a photograph taken by a passing motorist shows Clark standing no more than a few feet in front of his driver's side headlight with his gun drawn.

3

No. 17-10083

Villalpando's right foot was nearly touching the white line separating the shoulder from the traffic lanes. Clark testified that he was "concerned [Villalpando] had a weapon on his person." Clark radioed dispatch, telling them that he "got [Villalpando] outta the vehicle, his hands are up, he's facing me right now. Kept tryin' to reach for somethin'." Villalpando then lowered his hands and placed them on his head. Clark told dispatch that he had Villalpando at gunpoint and that Villalpando was currently obeying his commands but repeated that he "kept trying to reach for somethin'" in his vehicle.

Villalpando asked Clark "what's your problem?" and "who you calling motherf-cker?" Clark responded: "[you] kept reaching for stuff, you're not gonna listen to me." Villalpando tapped his chest and said "kill me." Clark assured him "nah, I'm not gonna kill you," and again radioed dispatch that backup "might want to step it up. He's saying kill me." As several more cars passed in view of the dash cam—including at least one in the lane closest to the shoulder—Villalpando turned his back to Clark. He then dropped his hands briefly to the back of his waistband and clasped his right wrist with his left hand. Clark again screamed "hey. Get your f-cking hands up now." Villalpando turned and raised his hands in the air and told Clark "I'm gonna walk to you." Clark yelled "no, stand right there" and "hey. Get your hands up" as Villalpando again dropped his hands briefly to his waist. Clark repeated himself: "stand right there . . . get to the back of the car." Villalpando again said to Clark "nah. Kill me."

Over the next several seconds, Villalpando began to walk slowly towards Clark with his hands on his head. Four times, Clark told Villalpando to "stand right there," and he instructed him twice to "get to the back of the car" and to "stop . . . stop right there." Villalpando twice verbally refused to comply, stating "no . . . no, I'm not." Fumbling slightly with his hat, Villalpando turned his

4

No. 17-10083

back to Clark, and continued moving towards him while spinning again to face him. Clark continued to yell repeated instructions: "back up . . . dude, back up. Back up, motherf-cker . . . Back up. Get to the back of the car."

As cars continued to pass in the traffic lanes, Villalpando kept walking slowly towards Clark with his hands on his head; Clark told Villalpando four more times to "get to the back of the car." Eventually, Villalpando got so close to Clark's vehicle on the driver's side that he was no longer visible on the dash cam. Seconds after Villalpando stepped off camera, Clark fired two gunshots. Clark yelled at Villalpando several times to "get your hands where I can see them" as he radioed to dispatch "shots fired." Clark told dispatch "he was coming at me . . . he kept coming at me. I gave him commands to stop. He kept coming at me, he wouldn't stop." Villalpando died several hours later. He was ultimately found to be unarmed.

Romero filed her original complaint in the district court on September 23, 2015, and defendants moved to dismiss. In her first amended complaint, Romero brought claims under 42 U.S.C. § 1983 against the City, Salame, and Clark, for failure to provide adequate training, excessive force, and deliberate indifference to medical needs. Romero also alleged that defendants conspired to deprive Villalpando of his Fourth Amendment rights in violation of 42 U.S.C. § 1985. Lastly, Romero brought claims under the Texas wrongful death and survival statutes, Texas Civil Practice and Remedies Code §§ 71.001 and 71.021. The district court granted defendants' motion to dismiss all claims against the City and Salame, as well as the § 1985 claim against Clark and the portion of Romero's § 1983 claim alleging indifference to Villalpando's medical needs.[1] Only Romero's excessive force claim under § 1983 against Clark was

---

[1] In her brief on appeal, Romero does not address her conspiracy claim under § 1985, her claim under § 1983 for indifference to Villalpando's medical needs, or her state law claims. Accordingly, these claims are waived. *See United States v. Lindell*,

No. 17-10083

allowed to proceed, and the district court allowed discovery limited to qualified immunity issues. The district court ultimately granted Clark's motion for summary judgment, holding that he was entitled to qualified immunity. Romero timely appeals.

## II

This court reviews a grant of summary judgment *de novo*, applying the same standard as the district court. *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). We construe "all facts and inferences in the light most favorable to the nonmoving party," *Dillon v. Rogers,* 596 F.3d 260, 266 (5th Cir. 2010) (citation omitted); but, "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela,* 684 F.3d 564, 571 (5th Cir. 2012). The plaintiffs bear the burden of demonstrating that a defendant is not entitled to qualified immunity. *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Further, although courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) (citing *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011).

---

881 F.2d 1313, 1325 (5th Cir. 1989). The portion of Romero's briefing addressing the claims disposed of by defendants' motion to dismiss discusses only her failure to train and inadequate screening/hiring claims against the City and Salame.

6

No. 17-10083

We review the district court's grant of a motion to dismiss under Rule 12(b)(6) de novo. *Quinn v. Guerrero*, 863 F.3d 353, 363 (5th Cir. 2017). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). The court accepts all well-pleaded facts as true and must consider those facts in the light most favorable to the plaintiff. *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir 2007).

## III

We first address the district court's grant of summary judgment in favor of Clark on Romero's § 1983 excessive force claim on the basis Clark was entitled to qualified immunity.

Qualified immunity shields from liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Accordingly, "qualified immunity represents the norm," *Harlow v. Fitzgerald,* 457 U.S. 800, 807 (1982), and courts should deny a defendant immunity only in rare circumstances, *see Brady v. Ford Bend Cty.*, 58 F.3d 173, 173 (5th Cir. 1995). Again, once Clark asserted his qualified immunity defense, the burden shifted to the plaintiffs to demonstrate that Clark is not entitled to its protection. *See Trent*, 776 F.3d at 376; *Brown*, 623 F.3d at 253.

In determining whether an officer is entitled to qualified immunity, courts engage in a two-step inquiry. *Tolan v. Cotton*, 134 S.Ct. 1861, 1865 (2014). First: "Taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, we ask "whether the right in question was 'clearly established' at the time of the violation." *Tolan*, 134 S.Ct at 1866 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Thus, the first

7

question is whether Clark violated Villalpando's Fourth Amendment right to be free from excessive force. *See Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

To state a claim for excessive force, Romero must demonstrate: "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (quoting *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)). Because Clark used deadly force, "our 'objective reasonableness' balancing test is constrained." *Flores*, 381 F. 3d at 399 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). The use of deadly force violates the Fourth Amendment unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11; *see also Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) ("An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm.").

Recognizing that "police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 396, the Supreme Court has warned against "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation," *Ryburn v. Huff*, 565 U.S. 469, 477 (2012). Accordingly, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In evaluating whether an officer acted reasonably, courts may consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Hogan v. Cunningham*, 722 F.3d

No. 17-10083

725, 734 (5th Cir. 2013) (quoting *Graham*, 490 U.S. at 396). The court "must consider all of the circumstances leading up to [the moment deadly force is used], because they inform the reasonableness of [the officer's] decisionmaking." *Mendez v. Poitevent*, 823 F.3d 326, 333 (5th Cir. 2016).

Contrary to Romero's assertions, the salient factual circumstances are uncontroverted and supported by the dash cam footage. First, Clark encountered Villalpando's car while responding to the scene of a suspected burglary—a felony offense. Villalpando did not stop when Clark activated his emergency lights and used his siren. Instead, Villalpando fled at a high rate of speed, ran a stop sign, and accelerated onto the highway. Once on the highway, Villalpando recklessly wove back and forth across four lanes of traffic and drove on the shoulder. Given his dangerous behavior, Clark reasonably suspected that the occupant or occupants of Villalpando's car "were involved in burglarizing or attempting to burglarize" the commercial building. When Villalpando finally stopped the vehicle on the shoulder of a highway exit, Clark issued several commands for him to make his hands visible, which Villalpando ignored at least once, reaching his right hand back into his driver's side window.[2] Despite several more clear commands to remain in his vehicle and keep his hands out of the window, Villalpando opened his driver's side door and stepped out. Clearly worried for his own safety, Clark told dispatch on more than one occasion to "step it up" and that Villalpando "kept trying to reach for somethin'." Villalpando twice told Clark: "kill me." All of this unfolded

---

[2] Romero disputes the number of times Villalpando reached his hands back into the vehicle, but this disagreement between the parties is immaterial. The video establishes that his right hand disappeared inside the vehicle at *least* once and possibly as many as three or four times. Even if Villalpando's hand suspiciously reached back inside the vehicle only once, it was reasonable for Clark to fear he may have been reaching for a weapon.

as multiple cars were passing in the traffic lines immediately to the left of the shoulder.

Over the next several minutes, Clark instructed Villalpando over and over again to stay where he was and keep his hands up. Villalpando deliberately ignored Clark's commands, walking towards Clark on the narrow shoulder, dropping his arms once to his waist, and fiddling with his hat. Clark testified that he "was concerned [Villalpando] could have a weapon on his person, and he may have been hiding a weapon on his person when he kept reaching back inside the car." As Villalpando walked towards Clark— deliberately flouting his repeated commands—Clark "feared for [his] life because all it would take from Villalpando was for him to push or shove [Clark] and he would easily end up in the traffic lanes," and Clark "knew cars were driving past [him] on the exit ramp at speeds that were high enough to be deadly."

Given the tense and evolving factual circumstances, Clark "reasonably believe[d] that [Villalpando] pose[d] a threat of serious harm." *Manis*, 585 F.3d at 843. Villalpando fled the scene of a suspected crime, drove recklessly and endangered other drivers, refused to obey roughly thirty commands to keep his hands visible and to stay in or near his vehicle, and approached Clark on a narrow highway shoulder directly adjacent to speeding traffic. At the time Clark shot Villalpando, he had walked so close to Clark's vehicle that he was no longer visible on the dash cam. Clark was forced to make a "split-second judgment[]—in circumstances that [were] tense, uncertain, and rapidly evolving—about the amount of force that [was] necessary." *Graham*, 490 U.S. at 396. That Villalpando was ultimately found to have been unarmed is immaterial—Clark reasonably feared for his own safety. We will not "second-guess[] a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn*, 565 U.S. at 477. In light of the

No. 17-10083

information available to him at the time of the shooting, Clark's decision to use deadly force was reasonable, and he did not violate Villalpando's Fourth Amendment right.[3]

Accordingly, the district court properly granted summary judgment to Clark on the basis of qualified immunity.

## IV

Because Romero has failed to demonstrate that Villalpando's Fourth Amendment rights were violated, her claims against the City and Salame for failure to train and inadequate screening/hiring cannot survive. *See Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006). In order to confer liability on the City and Salame for deficient supervisory conduct, there must be "a 'sufficient causal connection' between [the City's] conduct and the constitutional violation." *Id.* (quoting *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003). "[I]t is facially evident that this test cannot be met if there is

---

[3] Even if Clark had used excessive force in violation of Villalpando's Fourth Amendment right, Clark would still be entitled to qualified immunity because the right, defined at a fact specific level, was not clearly established at the time of the violation. *See Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). "A clearly established right is one that is 'sufficiently clear that every reasonable officer would have understood that what he is doing violates that right.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The Supreme Court has explained that courts must not "define clearly established law at a high level of generality." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, the question is "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct *in the 'situation [he or she] confronted.'" Id.* at 309 (emphasis added) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Romero does not cite to any controlling authority nor does she point to a "robust consensus of persuasive authority" that suggests Clark's actions were obviously unconstitutional. *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc). While authority need not be exactly analogous to aid the court in determining whether a right was clearly established, "this area is one in which the result depends very much on the facts of each case," and the authority must "squarely govern[]" the circumstances. *Brosseau*, 543 U.S. at 201. There simply is no such authority.

no underlying constitutional violation." *Id.* Accordingly, the claims were properly dismissed.

## V

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Clark, and AFFIRM the district court's dismissal of the claims against the City and Salame.