REVISED 5/19/2023

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 17, 2023

Lyle W. Cayce
Clerk

No. 21-10303

Ira Darlina Baker, individually, as the administratrix of the Estate of Darion Dev'on Baker, and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker; Mario Baker; Arlandra Williford,

*Plaintiffs—Appellants*,

*versus*

Richard Keith Coburn; Michael Joseph McHugh; City of Stratford, Texas,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for Northern District of Texas
USDC No. 2:19-CV-77

---

Before Graves, Willett, and Engelhardt, *Circuit Judges.*
James E. Graves, Jr., *Circuit Judge*:

This qualified immunity case arises from the death of Darion Baker, who was shot and killed by officers of the Stratford Police Department when he attempted to evade arrest by fleeing in a stolen car. The plaintiffs, Baker's minor child and his estate, appeal the district court's grant of summary

No. 21-10303

judgment to the defendants. Because there are still genuine disputes of material fact, we AFFIRM in part, REVERSE in part, and REMAND to the district court.

## I.

Darion Baker and his friend Gregory Dees ran out of money while on vacation in Los Angeles. To return home to Memphis, Tennessee, the men decided to steal an unoccupied Infiniti sedan. Shortly after doing so, the duo headed home.

Dees and Baker approached the town of Stratford, Texas, around 7:00 p.m. on February 21, 2018. At the same time, officers Richard Coborn[1] and Michael McHugh were patrolling the outskirts of town in an SUV. The officers noticed that the sedan suddenly slowed down. Perceiving this action to be suspicious, the officers followed the men to a Pilot Travel Center, a gas station with an adjacent convenience store near Highway 54.

After Baker and Dees entered the convenience store, the officers drove past the parked sedan, recorded its license plate, and relayed this information to police dispatch. After dispatch verified that the sedan was stolen, the officers decided to investigate further.

The officers parked near the convenience store, and Coborn went inside, where Baker and Dees were still shopping. Upon entry, three young men approached Coborn and informed him that Baker and Dees were asking suspicious questions about how to get to Memphis on backroads in order to evade police checkpoints. Baker, Dees, and Coborn then exited the convenience store together (with Coborn holding the door open for them). Baker got into the driver's side while Dees began to pump gas. Coborn climbed back

---

[1] Officer Richard Coborn's name is misspelled as "Richard Coburn" in the case caption, likely by a scrivener's error.

into the SUV. What happened next was captured on three different video cameras.[2]

The officers then drove directly behind the sedan and activated their police lights. Coborn and McHugh exited their SUV and approached the sedan with their guns drawn. Coborn ran to the driver-side door; McHugh positioned himself on the passenger side of the sedan. Upon seeing the officers, Dees dropped the gas pump and climbed into the front passenger seat.

The footage then shows the officers shouting commands at Baker and Dees, including "let me see your hands" and "roll the window down!" The sedan's side windows were darkly tinted, obstructing the officers' view inside. To get a better look, Coborn began striking the driver-side window with his firearm. Unable to break the window, Coborn moved directly in front of the sedan.

The videos then show the sedan's brake lights come on, but the car remained stationary. At this moment, McHugh can be heard yelling, "you go forward . . . ," but was interrupted by Coborn discharging his firearm into the windshield.

There is a disagreement between the parties regarding whether Coborn initiated firing his weapon before or after the sedan started moving.[3] They also disagree about what led up to and what actually took place during the shooting. According to the defendants, Baker dipped down below the

---

[2] The footage from the dashcam, McHugh's body camera, and the Pilot video can be viewed at the following links:

https://www.ca5.uscourts.gov/opinions/pub/21/21-10303_BodyCam.mp4

https://www.ca5.uscourts.gov/opinions/pub/21/21-10303_Dash-Video.mp4

https://www.ca5.uscourts.gov/opinions/pub/21/21-10303_Pilot-Station.mp4

[3] Coborn says that he began shooting because the car began moving toward him, but the dashcam video shows that the car did not move until after he began shooting.

dashboard as Coborn began firing his weapon. They also contend that Baker revved the engine as Coborn stood in front of the sedan. They stress that they feared Baker was going to either shoot or run over Coborn.

Plaintiffs' account differs. They claim that Baker ducked because Coborn began discharging his firearm.

What happened next is also disputed. Shortly after the initial shots rang out, Baker turned the wheels hard away from Coborn and began to accelerate toward the left. The plaintiffs argue that the sedan moved away from Coborn in an effort to avoid him. The officers claim the sedan moved straight ahead toward Coborn before moving left.

The sedan then moved past Coborn, who continued to fire. McHugh discharged his firearm moments later. According to McHugh, he delayed firing for two reasons: (1) to avoid shooting Dees in the passenger seat, and (2) to avoid shooting through the front passenger side window.

Baker was hit from behind by two gunshots. He died at the scene. One bullet traveled through soft tissue in his left shoulder, from back to front, right to left, stopping in the upper bone in his left arm. This shot was not fatal. The fatal shot traveled through the middle of Baker's upper back and exited on the front left side of his chest. Its path was from the back to the front and from right to left and upward. Dees was not injured.

Coborn does not recall how many shots were fired, but the videos show that he fired at least eight shots before the car moved. McHugh believes he fired his weapon five times. The Texas Ranger's investigation was unable to reveal whether it was officer Coborn's gun or officer McHugh's gun that fired the fatal bullet.[4]

---

[4] McHugh testified that he believes that he fired the shot that ultimately killed Baker. Nevertheless, it is otherwise unclear from the evidence which officer fired the fatal shot or the shots that struck the car from the rear.

No. 21-10303

Baker's family sued Coborn and McHugh under 42 U.S.C. § 1983, alleging the shooting constituted excessive force in violation of the Fourth and Fourteenth Amendments.[5] The officers invoked qualified immunity and moved for summary judgment.

The motion was referred to a magistrate judge, who recommended that the district court deny the officers' summary judgment motion. In response, the officers filed objections. The district court sustained their objections and granted the officers' motion on two grounds. First, the court concluded that the plaintiffs failed to establish that Coborn's actions violated clearly established law with respect to the first round of shots before the sedan had moved. Second, it found that the gunshots after the sedan had moved were objectively reasonable and therefore did not violate the Fourth Amendment. In doing so, the court did not reach the clearly established law analysis as to the second round of shots. This appeal followed.

## II.

The applicable standard of review is well-established. Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it could "affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* We view all evidence "in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in that party's favor." *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013). However, "we assign greater weight, even at the summary judgment stage, to the . . . video recording[s] taken at the

---

[5] They also sued the City of Stratford for municipal liability, but those claims are not before us.

scene." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)).

A qualified immunity case, however, changes the usual summary judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the [qualified immunity] defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* We review the district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017).

## III.

The plaintiffs challenge the district court's entry of summary judgment on two grounds. First, we address whether the doctrine of qualified immunity shields officer Coborn with respect to the first round of shots—while Coborn was standing in front of the stationary vehicle. We then turn to whether officers Coborn and McHugh violated Baker's Fourth Amendment rights in firing the second round of shots—when the sedan began to move away from Coborn.[6]

## A.

Plaintiffs first challenge the district court's conclusion that officer Coborn was entitled to qualified immunity as to the first round of shots.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, courts generally engage in a two-part

---

[6] The Government concedes that the shots were fired by Coborn and McHugh in two distinct episodes instead of one continuous volley.

inquiry asking: (1) whether an official's conduct violated a statutory or constitutional right of the plaintiff; and (2) whether the right was "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001).

The district court found that there are genuine disputes of material fact as to whether Coborn violated Baker's constitutional rights but held that the plaintiffs did not identify an analogous case from the Supreme Court or Fifth Circuit clearly establishing that "Coborn's actions violated clearly established law." Thus, our focus on appeal is whether those rights were clearly established.

"The clearly established inquiry is demanding, especially in claims for excessive force." *Harmon v. City of Arlington*, 16 F.4th 1159, 1167 (5th Cir. 2021) (citing *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019)). Such claims often involve officers' "mak[ing] split-second decisions" and "[t]he results depend 'very much on the facts of each case.'" *Id.* at 1166 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). This means existing precedent must "squarely govern[ ] the specific facts at issue, such that only someone who is plainly incompetent or who knowingly violates the law would have behaved as the official did." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (citation omitted) (internal quotation marks omitted).

When conducting this inquiry, courts must "frame the constitutional question with specificity and granularity," *Morrow*, 917 F.3d at 874–75, rather than "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). In other words, controlling authority or a robust consensus of persuasive authority must have placed the question "beyond debate," with "the right's contours . . . sufficiently definite that any reasonable official in the [officer's] shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (citation omitted).

No. 21-10303

Plaintiffs argue that clearly established law prohibited Coborn's initial shots because Fifth Circuit caselaw has long held that the "police cannot shoot a driver in a stationary car when the driver has not otherwise made suspicious movements." To support this proposition, plaintiffs point to *Edmond v. City of New Orleans*, 20 F.3d 1170 (5th Cir. 1994), *Ougel v. Amite City Police Dep't*, 352 F. App'x 941 (5th Cir. 2009), and *Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996). However, these cases are not factually similar enough to the situation Coborn faced to have placed the lawfulness of his actions beyond debate.

In *Edmond*, plainclothes police officers driving an unmarked police car cut off a vehicle driven by the plaintiffs. *Edmond*, 20 F.3d at 1170. The officers then got out of their car after blocking the plaintiffs' car in place. *Id.* Past victims of a robbery, the plaintiffs believed that they were about to be robbed and attempted to drive away. *Id.* Without identifying themselves, the officers shot at the plaintiffs, claiming that the driver drove directly at one of the officers and struck an officer. *Id.* We held that denying summary judgment is appropriate when "fact[ual] issues existed about whether a police officer's use of force was justified or was unreasonably created when [the officer] stepped in front of a moving car." *Id.*

Unlike in *Edmond*, Coborn's clothing and the flashing lights from the police SUV plainly identified him as law enforcement. Contrary to the plaintiffs' assertion, the district court did not erroneously rely on this fact, as the plaintiffs in *Edmond* expressly argued that "they would not have tried to get away if the police officers had identified themselves." *Id.* Further, the video evidence shows that Coborn stepped in front of the sedan *before* it began to move.

Accordingly, because the circumstances of the instant case are materially different from the circumstances of *Edmond*, we cannot conclude that the established law, in that case, would have put Coborn on notice that his

conduct was clearly unlawful. *See Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (stating that the focus of qualified immunity is whether the officer had "fair warning" that his conduct was unlawful).

In *Ougel*,[7] a suspect stole a car from a Porsche dealership and led law enforcement officials on a high-speed chase through Mississippi and Louisiana. *Ougel*, 352 F. App'x at 942. Eventually, several officers surrounded and stopped the vehicle. *Id.* Police ultimately shot and killed the suspect after one of the officers broke the car window and began trying to remove him. *Id.* We denied qualified immunity because "[f]iring a shot at an unarmed suspect whose left arm was restrained by a wrist lock and whose right arm was in the air would constitute an objectively unreasonable exercise of excessive force." *Id.* at 943.

Again, we cannot say under the facts of this case, Coborn would have been put on notice that his conduct violated Baker's constitutional rights. Baker was not partially restrained by an officer. Moreover, in *Ougel*, there was no concern about the car itself being used as a weapon, as the suspect, in that case, did not start the car and illuminate his brake lights directly in front of the officer. *See Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992) (observing that a vehicle can be used as a deadly weapon and if an officer believes he or others around him are in danger from the vehicle, it can be reasonable to use deadly force). Thus, this case is unhelpful.

In *Putnal*, officers found and shot a suspect sitting inside a vehicle after gunfire caused panic and confusion on a crowded beach. *Putnal*, 75 F.3d at 193. We held that it violated the Fourth Amendment to shoot someone

---

[7] *Ougel* is a nonprecedential case. It is well settled that unpublished opinions "cannot clearly establish the law," but they can illustrate or "guide us to such authority" by "restating what was clearly established in precedents they cite or elsewhere." *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019). To the extent we examine *Ougel*, we do so for this purpose.

who took no threatening action, was not holding a gun, was not warned, and who "may have barely had an opportunity to see [the officer] before [the officer] fired his gun." *Id.* at 198. We further explained, "[c]haos on the beach and [the plaintiff's] mere motion to turn and face [the officer] are not compelling reasons" to justify deadly force. *Id.*

This case is clearly distinguishable from ours. Baker was clearly aware of Coborn as he stood directly in front of the car. Further, Baker ignored multiple commands from the officers, and there was no concern in *Putnal* about the car being used as a weapon.

In sum, plaintiffs have not pointed to sufficient authority clearly establishing that Coborn's conduct violated the law under the specific circumstances he was facing, and thus he is entitled to qualified immunity.

## B.

We now turn to the constitutionality of the officers' second round of shots. The Fourth Amendment confers the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. A seizure is unreasonable if it involves excessive force. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). To prevail on an excessive-force claim, a plaintiff must prove he suffered (1) an injury (2) resulting directly and only from (3) an officer's use of objectively unreasonable force. *Ikerd v. Blair*, 101 F.3d 430, 433–34 (5th Cir. 1996). Excessive force claims are "evaluated for objective reasonableness based on the information the officers had when the conduct occurred." *Katz*, 533 U.S. at 207.

Whether the force used is excessive depends on the facts and circumstances of each case. *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021). This determination requires us to balance the individual's interest against the government's, weighing the *Graham* factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect]

is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013).

Considering the first and third *Graham* factors, Baker was suspected of committing car theft. When discovered by the officers, he actively resisted by refusing to comply with officers' commands and attempted to evade arrest by flight. These factors weigh in favor of the use of significant force. *See Ramirez v. Martin,* No. 22-10011, 2022 WL 16548053, at *2 (5th Cir. Oct. 31, 2022); *see also United States v. Harrimon*, 568 F.3d 531, 534 (5th Cir. 2009) (noting that under Texas law, fleeing in a vehicle constitutes a "purposeful, violent, and aggressive" felony).

However, the second factor—whether there is an immediate threat to safety—is generally the most important factor in determining the objective reasonableness of an officer's use of deadly force. *See Harmon*, 16 F.4th at 1167 (stating this factor "typically predominates the analysis when deadly force has been deployed").

In granting summary judgment, the district court found the use of deadly force objectively reasonable because "Baker's actions posed a threat of serious physical harm to Officer Coborn, who was standing in front of Baker's vehicle." The court also reasoned that the officers were entitled to qualified immunity because "once the officers perceived the car safely passed Officer Coborn, they ceased firing and began to pursue Baker on foot." We disagree.

At the outset, the district court erroneously failed to consider the facts in the light most favorable to Baker. At the summary judgment stage, the court should "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "The relevant question is whether, taking [Baker's] version of the facts as true, the

force used . . . was both excessive to the need and objectively unreasonable." *Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005).

In this case, there is summary judgment evidence to support plaintiffs' claim that Baker was hit by shots *after* the car safely passed the officers. First, Baker was shot twice in the back. "Common sense, and the law, tells us that a suspect is less of a threat when he is turning or moving away from the officer." *See Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021). The fatal and second bullet entered his upper back and exited the left side of his chest, which supports the plaintiffs' claim that Baker was shot from the rear while he sat facing forward.

Video, photo, and testimonial evidence in the record also support this conclusion.[8] The dashcam footage shows Coborn continuing to fire his weapon at the sedan after it had moved past him and continued toward the highway. Coborn's actions, apparent from the Pilot video, in running after the sedan and continuing to fire also support this view. Coborn himself testified that he continued to shoot as the sedan was driving away. Moreover, the bullet holes in the rear window, spoiler, trunk, rear seat, and the number of bullets fired at the car could also lead a jury to conclude that the officers violated Baker's rights.

This evidence, if credited by the jury, could contradict the officers' claims that they only fired at Baker when there was a threat of imminent danger. This is especially true since it is unclear which officer fired the shot that killed Baker, and it is clear that both officers shot at the rear of the sedan.

The officers argue that summary judgment should be affirmed because Coborn and McHugh's actions were objectively reasonable. However, several factual disputes preclude this determination.

---

[8] At oral argument, counsel for defendants also conceded that Coborn shot at the car more than "2 or 3 seconds" after the car had passed Baker.

According to the officers' version of events, Coborn began shooting because Baker was reaching under the dash for what Coborn feared was a gun. The officers further claim that Baker revved his engine as Coborn stood in front of the sedan. Plaintiffs, however, have produced evidence, through Dees, that Baker ducked only to avoid the shots fired by Coborn. Plaintiffs further argue that the contention that Baker revved the engine is flatly contradicted by the audio track on McHugh's body camera.

Dees' account brings into question whether any force was justified in the first instance. The videos show that Coborn began firing before the car began to move. If Baker ducked down to avoid being shot instead of reaching for a gun as Coborn feared, it does not appear that the use of deadly force, or the continued use of it as the car drove away, would have been required. Coborn concedes that deadly force was not necessary before the car moved, because "there was no threat of immediate bodily harm or injury." Thus, crediting plaintiffs' evidence, a reasonable fact finder could determine that a constitutional violation occurred. *See Flores v. City of Palacios*, 381 F.3d 391, 400 (5th Cir. 2004) (noting that the existence of a material fact in dispute would determine whether shooting into the suspect's tires from behind was reasonable).

The officers further argue that Baker posed an immediate threat, alleging that Baker drove toward Coborn, missed, and then fled toward a public highway. However, viewing the facts in the light most favorable to Baker, it is not clear that a reasonable officer would have perceived such a danger.

Plaintiffs posit through video evidence that the sedan never moved toward Coborn because the wheels were turned sharply to the left as the sedan moved slowly away from the pumps. They further argue that the video evidence shows that the fatal shot was fired from behind after Baker safely drove past both officers. And there were no other bystanders in the sedan's path.

The evidence in the record does not resolve this dispute. The video evidence shows Baker turning the wheels hard to the left and accelerating while Coborn stood at the sedan's midpoint. The sedan then accelerated past Coborn, who continued to fire as he trailed the sedan from behind. Seconds later, McHugh is seen firing his weapon.

Thus, the objective reasonableness of the officers' fear of Baker is dependent upon the acceptance of their account of the shooting. If the facts are taken in the light most favorable to the plaintiffs, the danger presented by Baker was not so grave as to justify the use of deadly force. Even assuming Coborn was in front of the sedan and was in danger at some point, a jury could find that the officers fired at Baker when it was no longer objectively reasonable for them to believe that they were in peril.

The officers respond by arguing that, even if Baker had safely passed them and was no longer an immediate threat, they were permitted to continue shooting at the car until it was disabled. Not so. Although our precedent gives an officer's decision to shoot an unarmed suspect in a speeding car considerable latitude, the officer must have cause to believe that the car poses an immediate threat. *See, e.g.*, *Harmon*, 16 F.4th at 1164 (finding that a vehicle was a threat as it sped off with an officer holding on to its edge); *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007) (holding that a police officer was justified in using deadly force against a car accelerating toward him). *But see Lytle v. Bexar County*, 560 F.3d 404, 413–14 (5th Cir. 2009) (stating that "*Scott[ v. Harris*, 550 U.S. 372 (2007)] did not declare open season on whether the fleeing suspect posed such a threat that the use of deadly force was justifiable").

In *Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009), we denied qualified immunity to an officer who had fired his weapon repeatedly at a car that was three or four houses down the street and driving away from him. 560 F.3d at 414. In reaching our holding, we recognized that while the officer may have been in significant danger earlier in the encounter, "an exercise of force that

No. 21-10303

is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Id.* at 414. The relevant inquiry, therefore, is whether the officer used a justifiable level of force in light of the continuing threat of harm that a reasonable officer could perceive.

While the facts of this case vary somewhat, like in *Lytle*, continuing to shoot at Baker's vehicle as he drove away could support a finding that the force used was unreasonable. *Id.* at 412–13.

Finally, the officers contend, and the district court agreed, that *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007), establishes that their actions were objectively reasonable.[9] In *Hathaway*, a police officer stopped a vehicle in order to investigate a gang-related altercation. 507 F.3d at 315. When the officer, who was on foot, was approximately eight-to-ten feet from the front of the car, it suddenly accelerated towards him. *Id.* at 316. He attempted to get out of the way, but when he realized that he would not be able to do so, he decided to fire his weapon. *Id.* The shot hit the driver of the vehicle and killed him. *Id.*

On these facts, we held that the officer's use of deadly force was justified even though he could not specifically recall when he fired his weapon.

---

[9] In reaching this conclusion, the court relied on its view that "Coborn appears to take several hurried, stumbling steps backwards to avoid being hit." The court draws this conclusion from its reading of the dashcam footage stating: "[I]f one watches the top of Officer Coborn's head as the car moves and one can observe that his weight has shifted backwards as he pivots after the car." Again, the district court erred by not viewing the evidence in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As the plaintiffs correctly point out, the top of Coborn's head remains visible throughout the video, which suggests that he did not stumble. Further, as the district court concedes, the video is difficult to see. At this stage, "a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). That standard is not met here. Based on the videos and the evidence in the record, a reasonable juror could believe that Coborn was actually getting into a shooting stance without ever moving backward as the plaintiffs suggest.

*Id.* at 321–22. In doing so, we emphasized two factors in determining that the officer's use of deadly force was reasonable: (1) the limited time the officer had to respond, and (2) the officer's proximity to the path of the vehicle. *Id.*

Despite some similarities, there are stark differences between this case and *Hathaway*. In *Hathaway*, there was no question that the life of the officer was endangered by the suspect throughout the interaction. The suspect demonstrated multiple times that he was willing to injure the officer "accelerat[ing] towards [the officer], turning first to the right, then back to the left, and then finally back towards the center of the roadway as [the officer] attempted to get out of the way." *Id.* at 316. The officers reacted with deadly force only after he "realized that he was not going to be able to get out of the [car's] path." *Id.*

Our analysis in *Hathaway* also relied heavily on a Fourth Circuit case, *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005). There, the plaintiff was a driver involved in a high-speed chase. *Id.* at 474. After officers yelled at him to stop, plaintiff accelerated toward officers, and they began firing their weapons as soon as the car accelerated toward them. *Id.* at 475. The vehicle then passed the officers, avoiding them by several feet, but "they continued to fire their weapons at [plaintiff] from the passenger side of the vehicle and from behind." *Id.*

The Fourth Circuit held that the officers were entitled to qualified immunity for the initial group of shots because a reasonable officer could have believed that plaintiff "presented a threat of serious physical harm." *Id.* at 480. However, viewing the record in the light most favorable to the plaintiff, "once [his] vehicle passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots." *Id.* at 482.

In *Hathaway*, we explained that the officer's conduct at issue, in that case, was "not an instance, as in *Waterman*, where an officer fired after the

perception of new information indicating the threat was past." *Hathaway*, 507 F.3d at 322.

Here, there are significant factual disputes about the manner in which the incident took place. If the facts are as the officers alleged them—that Baker drove straight at Coborn and missed, deadly force may well be reasonable. However, at the summary stage, the court must draw all inferences in favor of plaintiffs' version of facts. *Tarango*, 709 F.3d at 501. The facts here—viewed in the light most favorable to plaintiffs—show that Baker attempted to drive away from Coborn, and when Baker safely did so, Coborn and McHugh continued to fire in an attempt to capture Dees and Baker. Given these facts, a reasonable factfinder could determine that the officers acted unreasonably when they fired the second round of shots.

Consequently, we are not convinced that the degree of force used was objectively reasonable. *Graham*, 490 U.S. at 396. Instead, a jury could reasonably find that McHugh and Coborn violated Baker's Fourth Amendment right to be free from excessive force. "By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly weighed the evidence and resolved disputed issues in favor of the moving party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The plaintiffs have established genuine disputes of material fact regarding whether the officers' use of force was excessive and objectively unreasonable.[10]

The district court did not address whether Baker's rights with respect to the second round of shots were clearly established. This court will generally not address arguments that are not properly raised below. *See Kelly v.*

---

[10] To be clear, the objective reasonableness of the defendant officers' conduct goes to the question of whether Baker's constitutional right against excessive force was violated, not the question of whether that right was clearly established under these particular circumstances. *See Katz*, 533 U.S. at 201–04. We are not adding a standalone "objective reasonableness" element to the Supreme Court's two-pronged test for qualified immunity.

No. 21-10303

*Foti*, 77 F.3d 819, 822 (5th Cir. 1996). We decline to do so here. We therefore reverse the district court's opinion granting summary judgment as to the second round of shots and remand to the district court.[11]

* * *

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND to the district court for further proceedings consistent with this opinion.

---

[11] Further discovery may suggest revisiting the issue of qualified immunity. Moreover, qualified immunity remains a possible defense and a question to be determined by the jury. *See* Fifth Circuit Pattern Jury Instructions (Civil Cases) § 10.3 (2020).