# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 7, 2025

Lyle W. Cayce
Clerk

No. 24-40239

Colton Carico,

*Plaintiff—Appellant*,

*versus*

Derek Bristow,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 5:22-CV-95

_____

Before Southwick, Oldham, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

Police officers responded to a single-car accident that led them to Colton Carico's home. Carico came out of the house with a rifle, which he pointed only at himself. When ordered to drop the rifle, he instead turned around and began walking back inside. An officer shot him once in the back. Carico sued, arguing the officer violated his constitutional rights. The

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

district court awarded summary judgment to the officer based on qualified immunity.  We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

Officer Derek Bristow responded to a single-vehicle accident and discovered the vehicle was registered to Colton Carico.[1]  Carico was not at the scene, so Officer Bristow began driving to his address.  On the way, Officer Bristow encountered a witness who described seeing a white male get into a tan vehicle with an Oklahoma license plate.  When Officer Bristow arrived at Carico's address, he found a sedan with Oklahoma license plates in the driveway.  Kayla Reger answered the door and identified herself as Carico's girlfriend.  She repeatedly denied picking Carico up or even seeing him.  Reger ultimately admitted she was lying.

Officer Bristow then asked to speak with Carico.  Carico appeared and spoke to Officer Bristow through an open window in the storm door.  Though Carico acknowledged he had been in an accident, he claimed someone else was driving but had "disappeared."  When asked to step outside, Carico instead closed the interior door.  Seconds later, Reger opened the interior door and told Officer Bristow that Carico was "really mad."  Officer Bristow explained to Reger that he wanted Carico to step outside "due to his slurred speech and his red, glossy eyes."

Carico returned to the door and insisted he was not driving during the accident.  When asked how much he had had to drink, Carico responded, "enough for you not to know."  Officer Bristow threatened to arrest Carico if he did not cooperate.  Reger then exited the home.  Carico remained inside

_____

[1] The entirety of Officer Bristow's response to the call, including his use of deadly force, is captured on his body-worn camera.  The use of force is also captured on the body-worn camera of Officer Jacob McCraw.

watching through the open storm door window briefly before disappearing into the home.  A few minutes later, Carico closed the interior door again while Reger remained outside.  Approximately one minute later, Carico opened the door again and asked if he could go to bed.  Officer Bristow told him no and to step outside.

Carico then stepped outside the house but remained next to the open door.  He was holding the barrel of a rifle to his chin with his left hand, while his right arm was straight down near but at least for some of the time not on the rifle's trigger.  Carico said he would shoot himself in the head.  Officer McCraw and Officer Bristow each yelled "drop the gun" once, and Bristow yelled "move" while Reger repeatedly yelled "no!"  Carico turned and began moving back inside the house.  His left hand remained on the rifle, holding it upright with his hand halfway between the stock and the muzzle.  It is unclear where Carico's right hand was until one second before he was shot, when the video footage shows Carico's right hand was off the rifle while he used his right arm to push the door open as he moved inside.  After Carico had completely turned and was facing inside the house, Officer Bristow shot him once in the back.  The bullet struck Carico's spine and permanently paralyzed him.  Approximately five seconds had passed between Carico stepping outside with the rifle and Officer Bristow shooting him.  During that time, Carico never pointed his weapon at anyone but himself or threatened to harm anyone but himself.

Carico sued, asserting claims under 42 U.S.C. § 1983 against Officer Bristow and the City of Paris, Texas, in the United States District Court for the Eastern District of Texas.  He claimed that Officer Bristow used excessive force in violation of his Fourth Amendment rights. Officer Bristow moved for summary judgment, asserting qualified immunity.  The district court determined Officer Bristow was entitled to qualified immunity and

granted summary judgment in Officer Bristow's favor.    Carico timely appealed.

## DISCUSSION

"We review the district court's grant of summary judgment *de novo*, applying the same standard as the district court." *Baker v. Coburn*, 68 F.4th 240, 244–45 (5th Cir. 2023).    Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). The dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*   The assertion of qualified immunity shifts the burden "to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).   All inferences must be drawn in the plaintiff's favor.    *Id.*    "[W]e review evidence in the light most favorable to the nonmoving party," but "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).   When a video recording is present, we "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

"To determine whether qualified immunity applies, courts generally engage in a two-part inquiry asking: (1) whether an official's conduct violated a statutory or constitutional right of the plaintiff; and (2) whether the right was 'clearly established' at the time of the violation." *Baker*, 68 F.4th at 245. We are permitted to start with either part of the inquiry and end there too depending on the result of the analysis. *Garcia v. Blevins*, 957 F.3d 596, 600

(5th Cir. 2020). We begin by analyzing whether Carico's constitutional rights were violated.

To succeed on an excessive force claim, Carico must establish "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005). "Excessive force claims are necessarily fact-intensive." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). "The test for reasonableness is 'not capable of precise definition or mechanical application.'" *Joseph ex rel. Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In evaluating reasonableness, we typically consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. We consider the totality of the circumstances to determine if the level of force is justified. *See Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). We must account "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

"When an officer uses deadly force, that force is considered excessive and unreasonable 'unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018)). The question, therefore, is "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Id.* (quoting *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996)).

Carico asserts that (1) Officer Bristow's use of force was excessive and unreasonable because Carico did not pose an immediate threat, and (2) it was clearly established that Officer Bristow could not shoot him if he did not pose an immediate threat. Carico argues he did not pose an immediate threat for three reasons: (1) Officer Bristow knew that Carico did not threaten to harm anyone except himself; (2) Carico was actively deescalating the situation by putting the rifle down; and (3) there is no evidence that Carico intended to harm anyone other than himself. Carico argues the district court erred by failing to view the evidence in the light most favorable to him and ignoring genuine disputes of material fact as to whether his actions were threatening, whether the officers adequately warned him, and whether the officers gave him sufficient time to comply before resorting to deadly force.

Two cases are central to Carico's arguments: *Roque v. Harvel*, 993 F.3d 325 (5th Cir. 2021) and *Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) (*en banc*). This court found genuine disputes of material fact precluded summary judgment in both cases. Carico argues this case is like *Roque* and *Cole*, and therefore a jury must determine whether a reasonable officer would have considered Carico to still be a threat once he turned his back to the officers. We consider the applicability of each precedent.

In *Roque*, we considered the fatal shooting of a suicidal man. 993 F.3d at 329. There, a man repeatedly yelled at officers to shoot him as he held what was later determined to be a BB gun to his head. *Id.* at 330. He was told to drop the gun once, but video evidence showed he instead turned to face the officers. *Id.* The man was then shot once, and a video showed the gun falling to the ground. *Id.* Two seconds later, the officer attempted to shoot him again but missed. *Id.* Two seconds after that, he was fatally shot. *Id.* The officer claimed he took each shot because he believed the man was a danger to the life and safety of a bystander. *Id.* On appeal, the parties did not dispute the constitutionality of the first shot, so this court considered only

the second and third. *Id.* at 333. The district court found factual disputes related to the final two shots; we concluded those factual disputes were material and, therefore, precluded summary judgment. *Id.* at 333–34. Importantly, we determined the factual disputes as to whether the man was still armed and still moving were relevant to "whether a reasonable officer would have known that [the man] was incapacitated after the first shot." *Id.* Consistent with our precedent, we acknowledged the man would no longer be a threat if he was incapacitated, "[a]nd if he no longer posed a threat, [the officer's] second and third shots were excessive and unreasonable." *Id.*

Carico argues that, as in *Roque*, video evidence shows he had taken one hand off the rifle, such that he "only held the rifle's barrel in a position where he could not have fired, to set it down while he moved away from everyone at the scene." Carico argues that he therefore "posed far less threat than the [man] in *Roque*, as there was never a moment when Carico waved his gun at anyone other than himself." Carico omits two vital differences from his analysis. First, the man in *Roque* had been shot once already and was possibly incapacitated by the time he was fatally shot. *Id.* at 330. Second, video evidence here shows, and Carico concedes, that he was still holding the firearm in one hand when he was shot.

*Cole* also involved a suicidal man. 935 F.3d at 448. There, the district court found genuine disputes of material fact that could allow a reasonable jury to conclude that the man did not pose a threat to the officers so as to justify shooting him without a warning. *Id.* at 453. Before he was shot, the man "backed out from the tree line in front of [the officers], 'unaware of the [o]fficers' presence.'" *Id.* at 448–49. The officers did not warn him or give him an opportunity to disarm himself. *Id.* at 449. The officers who shot him knew he "had already encountered fellow officers and walked away from them with his gun to his head, non-responsive, but without aggressive action." *Id.* at 455. Factual disputes existed regarding what the officers knew

before the shooting, whether they warned the man before shooting him, and what actions the man took before the shooting. *Id.* at 457. This case does not present the same factual concerns. Here, it is undisputed that Carico knew the officers were there, the officers shouted warnings to Carico, and Carico turned his back and began moving into his home, out of the officers' sight, after the warnings.

Carico cites another of our precedents for the proposition that it is excessive force to shoot someone who is turned away. *See Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021). In *Poole*, an officer shot an unarmed man entering his truck after a low-speed chase. *Id.* at 422. The district court found factual disputes as to whether the officer warned the man before shooting him, the man was turned away during the shooting, and the officer could see the man's hands were empty. *Id.* at 423–24. The district court "determined that a jury could find [the officer] shot [the man] in the back, without warning and knowing his hands were empty" and denied qualified immunity. *Id.* at 424. We affirmed the district court's holding, emphasizing the "manifest unreasonableness of shooting an individual the officer can see is unarmed and not aggressive." *Id.* at 424.

Carico correctly cites *Poole* for the proposition "that it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead,'" and "a suspect is less of a threat when he is turning or moving away from the officer." *Poole*, 13 F.4th at 425 (quoting *Garner*, 471 U.S. at 11). Nevertheless, the presence, or even suspected presence, of a firearm changes the analysis. *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023). In fact, "whether the suspect is armed is often the key factor in determining if a threat to the officer justifies the use of deadly force." *Poole*, 13 F.4th at 425. Even if there is no weapon, "binding caselaw demonstrates that what matters is whether [the officer] could *reasonably believe* that [the man] was reaching for or had a gun." *Winder v. Gallardo*, 118 F.4th 638, 646 (5th Cir. 2024).

Although Carico was turned away from the officers, the rifle was still in Carico's left hand, and Carico was attempting to move back into the residence, where he would be out of sight of the officers. Officer Bristow stated in an affidavit that he "could hear Carico talking to someone inside the residence" and "[i]t almost sounded like he was throwing things inside of the residence" before he exited with the rifle. The officers "had not cleared the interior of the residence and [they] did not know if there was another person inside the residence who may be shot by Carico." Furthermore, Officer Bristow "knew the exterior walls [of Carico's metal residence] could easily be penetrated by a rifle round" and the officers' "police vests could not withstand a bullet from a high-powered caliber rifle." Regardless of whether Carico was truly moving inside to place his firearm down, a reasonable officer on the scene could have understood Carico's actions as an attempt to remain armed and take cover, making him a threat to the officers, Reger, and any other potential bystanders inside the house, even as his back was turned to the officers.

As to the failure to adequately warn, Carico cites several cases, but each involves disputes as to whether the officers warned the person *at all*. *Cole*, 935 F.3d at 457; *Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996); *Graves v. Zachary*, 277 F. App'x 344, 349 n.7 (5th Cir. 2008); *Giardina v. Lawrence*, 354 F. App'x 914, 916 (5th Cir. 2009). That factual dispute does not exist here, as Carico concedes both officers warned him to drop his weapon, Officer Bristow did not shoot Carico until he turned away after the warning, and Carico was still holding the firearm with one hand. Carico also argues that he "was putting his rifle down, *just as Bristow instructed*." Therefore, unlike in *Roque*, *Cole*, and *Poole*, Carico has failed to show a genuine dispute of material fact.

Hindsight can bring clarity, but we are to give ourselves "the perspective of a reasonable officer on the scene." *Betts v. Brennan*, 22 F.4th

No. 24-40239

577, 582 (5th Cir. 2022) (quoting *Graham*, 490 U.S. at 396). We must avoid evaluating the officers' actions in a way that is "more reflective of the 'peace of a judge's chambers' than of a dangerous and threatening situation on the street." *Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008) (quoting *Leavitt*, 99 F.3d at 643). As we have already explained, we must consider "the fact that police officers are often forced to make split-second judgments" regarding "the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Considering the totality of the circumstances — including Carico's intoxicated appearance, his unwillingness to cooperate, his sudden appearance with a rifle, and his actions of turning away and moving into the residence while still holding the rifle after being told to drop the weapon — a reasonable officer on the scene could have perceived Carico as an immediate threat to any unknown persons inside the home, his girlfriend standing next to him, or the officers. Therefore, it was not "clearly excessive" or "unreasonable" for Officer Bristow to use deadly force. We agree with the district court's conclusion that Carico's constitutional rights were not violated.

AFFIRMED.