# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 8, 2025

Lyle W. Cayce
Clerk

No. 24-60244
Summary Calendar

_____

Dwight Winkley, Father and Wrongful Death Beneficiary of Isaiah Winkley, *deceased*, and *as Representative of* all Wrongful Death Beneficiaries of Isaiah Winkley; Cathy Winkley, *as Wrongful Death Beneficiaries of Isaiah Winkley, deceased*; Shanna Winkley Edel, *as Wrongful Death Beneficiaries of Isaiah Winkley, deceased*; Jeremiah Winkley, *as Wrongful Death Beneficiaries of Isaiah Winkley, deceased*; Danielle Winkley Hutchinson, *as Wrongful Death Beneficiaries of Isaiah Winkley, deceased*,

*Plaintiffs—Appellees*,

*versus*

Michael Chase Blackwell, *Individually*,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:23-CV-213

_____

Before Richman, Douglas, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-60244

In this interlocutory appeal, former deputy Michael Blackwell challenges the district court's denial of his motion for summary judgment based on qualified immunity after he fatally shot Isaiah Winkley. Because we agree with the district court that genuine disputes of material fact exist regarding whether Isaiah posed an immediate threat when Blackwell shot him, we affirm.[1]

## I

Just after 7:00 a.m. on December 10, 2022, Brandon Wascom called 911 in Hancock County, Mississippi, to report that he had seen a man breaking into the home of his cousin, who was away for work. The 911 operator reported Wascom's description of the man, later identified as Isaiah Winkley, to the deputies en route to the scene, sharing that he was a "white male, black pants, no shirt" and that Wascom said he did not "look in his right state of mind." The dispatcher also advised the deputies that Isaiah had a "[w]ire and a chain ball" in his hand, that there were "a lot of guns located in the house," and that the homeowner was not at home. The operator further stated that Isaiah "mentioned hunting dogs" when Wascom confronted him earlier, but the operator described nothing else about the earlier verbal confrontation between Wascom and Isaiah. After Wascom updated the operator regarding a weapon that Isaiah may have been holding,

---

[1] *See Meadours v. Ermel*, 483 F.3d 417, 424-25 (5th Cir. 2007) (affirming the denial of summary judgment and remanding for trial after agreeing with the district court that there exist genuine disputes of material fact in the case). *But see Ambler v. Nissen*, 116 F.4th 351, 356, 364-65 (5th Cir. 2024) (dismissing for failure to invoke the court's interlocutory jurisdiction because the court can only consider issues of qualified immunity if they are purely legal), *cert. denied*, ___ S. Ct.___, 2025 WL 1287084 (May 5, 2025); *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012) ("Under the applicable law, we have no jurisdiction to review a district court's determination that there are genuine disputes of fact where we have decided, as a matter of law, that those factual issues are material.").

the operator in turn updated the deputies that "[c]omplainant believes he may see a weapon in his hand" but he was "[u]nsure if it's a gun."

Three deputies responded: Chris Sholar, Michael Blackwell, and Laura Yeager. Police dash cameras and body cameras captured the encounter between Isaiah and the police. Sholar's dash camera shows the officers' arrival at the scene, but he was not wearing a body camera. There is no dash camera footage from Blackwell's car, but he was wearing a body camera during the encounter. However, his body camera shows only the first few seconds of his interactions with Isaiah, then the camera turns to the side and does not capture the shooting or the moments leading up to it. Yeager's body camera footage provides the most complete recording of the encounter, though her position during the encounter makes some of her footage ambiguous.

As the deputies approached, Wascom sat waiting on his four-wheeler at the intersection of the paved road and a dirt road, about eighty yards away from the house, according to Blackwell's later estimation. Blackwell drove past Wascom without stopping. When Blackwell, Sholar, and Yeager arrived at the house, they found Isaiah in the back yard. Blackwell had K-9 Officer Dark on a leash in his left hand while he carried his sidearm in his right hand. As he initially moved toward Isaiah, who was standing inside the fenced backyard, Blackwell ordered, "Hey, show me your hands, right now." He and Sholar then repeatedly yelled at Isaiah to "drop it!" and "drop it now!" Based on their later instruction to "drop the pole," it seems they were referring to the "T-post," approximately six feet long with "a sharp shovel metal piece on the bottom," that Isaiah was holding in his right hand. Isaiah also appeared to be gripping an unidentifiable object in his left hand. As they yelled at Isaiah, Blackwell moved past the gate into the backyard so that he was on the same side of the fence as Isaiah, while Sholar remained outside of

the fence. Yeager also remained outside of the fence, positioning herself several yards behind Sholar.

Sholar then shot Isaiah with his taser from outside of the metal fence, causing him to fall down, but he stood back upright, T-post still in hand, only three seconds later. While Isaiah was on the ground, Blackwell approached him but then backed away once Isaiah was back on his feet. Immediately after Isaiah stood up, he took two small steps toward Blackwell but otherwise made no forward movement for the rest of the encounter. Sholar tased Isaiah over the fence again, causing Isaiah to bend over and shift back and forth several times, but he remained on his feet. Following the second taser deployment that failed to bring Isaiah down, Sholar said to the other deputies, "It's not working, man," seemingly referring to the taser. In response, Blackwell, who had his sidearm drawn, told Sholar and Yeager, "I'm going to shoot him." Isaiah then backed up a few steps so that he was farther from Blackwell and partially obscured by a large wooden fence post. When he stopped, his arms were crossed in front of his chest so that the T-post was on his left side, vertical and stationary.

All three deputies continued to yell, "Drop it!," to which Isaiah responded, "Shoot me!" Isaiah then uncrossed his arms and lowered his left hand so that it was dangling by his side; his right side and the T-Post remained obscured by the large wooden fence post. The second after Isaiah lowered his left hand, Blackwell fired four shots at Isaiah, approximately fourteen seconds after he had taken two small steps toward Blackwell or any of the officers, nine seconds after he had backed away from Blackwell, and ten seconds after Blackwell told Yeager and Sholar that he was going to shoot Isaiah. When he pulled the trigger, Blackwell was standing approximately eight feet from Isaiah.

Isaiah immediately collapsed to the ground, and the deputies continued to shout at him to drop the T-post. Yeager eventually handcuffed him, removing an item from Isaiah's left hand in the process—revealed then to be a blue container of Mentos candies—as Isaiah continued to lie on the ground, face down in the grass, unmoving. About nine minutes after the shooting, Yeager responded to "central" and told them that Isaiah no longer had a pulse. Yeager's ongoing body camera footage and medical documentation suggest that the officers did not attempt CPR to resuscitate Isaiah.

Throughout the encounter, Isaiah held the post upright by his side; he did not wave it at the deputies. Blackwell twice described Isaiah as using the T-post as a "walking stick" in an interview about the incident with the Mississippi Bureau of Investigation. Aside from the moments when Isaiah had fallen and was attempting to stand back up, the bottom of the post remained on the ground or within a couple of inches of the ground and did not point forward or backward. Throughout the encounter, the only words Isaiah said to the deputies were, "Shoot me!," a phrase which he repeated multiple times at escalating volumes. Because he was not wearing a shirt, his waistband was visible to the deputies at all times, and there was nothing protruding from his waistband. His hands were also visible to the deputies throughout the encounter, as he did not reach behind his back or anywhere else beyond their line of sight.

The autopsy report from the medical examiner stated that Isaiah was five feet nine inches tall and weighed 165 pounds. It reported his cause of death as "multiple gunshot wounds," describing five separate gunshot wounds in total, including two gunshot wounds to the chest. A toxicology report showed that he had no drugs or alcohol in his system when he died, only caffeine.

In the wake of the shooting, Blackwell signed a non-prosecution agreement with the United States, which was represented by the Criminal Section of the Civil Rights Division of the Department of Justice and the United States Attorney's Office for the Southern District of Mississippi. Blackwell promised to resign from his position and never to seek employment in law enforcement again in exchange for the United States' promise not to prosecute him for shooting Isaiah.

Isaiah's father, Dwight Winkley; his mother, Cathy Winkley; his sisters, Danielle Hutchinson and Shanna Edel; and his brother, Jeremiah Winkley, jointly sued multiple defendants, including, as relevant to this case, Blackwell individually and in his official capacity as a deputy. Bringing suit under 42 U.S.C. § 1983, the Winkley family alleged in relevant part that the defendants had violated Isaiah's Fourth Amendment right to be free from an unreasonable seizure when they "shot and killed Isaiah without provocation or justification." The Winkleys filed their suit in the District Court for the Southern District of Mississippi. Blackwell moved for judgment on the pleadings, seeking dismissal of the official capacity claims against him, and the court granted that motion. Blackwell then moved for summary judgment based on qualified immunity. The district court denied the motion. Blackwell timely filed an interlocutory appeal of that denial of qualified immunity.

## II

"Qualified immunity shields government officials from liability" for alleged constitutional violations "if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known.'"[2]  "Qualified immunity shields from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'"[3]  "To determine whether qualified immunity applies, courts generally engage in a two-part inquiry asking: (1) whether an official's conduct violated a statutory or constitutional right of the plaintiff; and (2) whether the right was 'clearly established' at the time of the violation."[4]  Courts have "discretion 'in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"[5]

Although "[o]rdinarily, we do not have jurisdiction to review a denial of a summary judgment motion because such a decision is not final within the meaning of 28 U.S.C. § 1291," the "denial of qualified immunity on a motion for summary judgment is immediately appealable if it is based on a conclusion of law."[6]  Typically, "the party who moves for summary judgment bears the initial burden to show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[7]  However, a public official's "good-faith assertion of qualified immunity . . . alters the

---

[2] *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[3] *Id.* at 745 (quoting *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)).

[4] *Baker v. Coburn*, 68 F.4th 240, 245 (5th Cir. 2023) (quoting *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).

[5] *Trent v. Wade*, 776 F.3d 368, 377 (5th Cir. 2015) (quoting *Pearson*, 555 U.S. at 236).

[6] *Perniciaro v. Lea*, 901 F.3d 241, 250 (5th Cir. 2018) (quoting *Palmer v. Johnson*, 193 F.3d 346, 350 (5th Cir. 1999)).

[7] *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).

usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available."[8]  Accordingly, once the official moves for summary judgment on the basis of qualified immunity, "[t]he plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury" as well as that "the plaintiff's version of those disputed facts . . . constitute[s] a violation of clearly established law."[9]

When "the plaintiff is the non-moving party, we construe all facts and inferences in the light most favorable to the plaintiff."[10]  However, "a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings."[11]  We "review[] materiality and legal conclusions de novo."[12]  These legal conclusions include the "scope of clearly established law and the objective reasonableness of those acts of the defendant that the district court found the plaintiff could prove at trial."[13]

Blackwell argues that the district court erred in denying qualified immunity because he did not violate a clearly established constitutional right. The Winkley family in turn argues that this court lacks jurisdiction over this appeal because Blackwell's argument is "based upon disputes of genuine material facts."  We address the Winkleys' jurisdictional argument first.

---

[8] *Id.* at 329-30 (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)).

[9] *Id.* at 330.

[10] *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc).

[11] *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[12] *Amador v. Vasquez*, 961 F.3d 721, 727 (5th Cir. 2020) (italics omitted).

[13] *Id.* (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 456 (5th Cir. 2001)).

No. 24-60244

## III

The Winkleys argue that this court "lacks jurisdiction to hear any portion of [an] appeal where the appellant's argument is based upon disputes of genuine material facts." Under their reading, the district court's order was "unquestionably based on a factual dispute" and therefore is beyond this court's proper scope of review.

The district court concluded that "there exist material questions of fact whether Officer Blackwell faced an immediate threat of death or bodily injury at the time he applied deadly force." The Winkleys are correct that, generally, we may not second-guess the district court's determination that genuine disputes of fact exist when reviewing the denial of qualified immunity in an interlocutory appeal.[14] However, we may review the materiality of those factual disputes in determining "whether the officer is entitled to summary judgment even assuming the accuracy of the plaintiff's version of the facts."[15] Additionally, "we are permitted to review genuineness where, as here, video evidence is available."[16] Therefore, "[a]lthough the district court's factual findings are given near-complete deference, we cannot disregard clear video footage when available: If events

---

[14] *See Escobar v. Montee*, 895 F.3d 387, 393 (5th Cir. 2018) ("When reviewing the denial of summary judgment based on [qualified immunity], 'we have jurisdiction to "review the materiality of any factual disputes, but not their genuineness."'" (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016))).

[15] *Melton*, 875 F.3d at 261.

[16] *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023) (citing *Poole v. City of Shreveport*, 13 F.4th 420, 424 (5th Cir. 2021)), *cert. denied*, 145 S. Ct. 435 (2024).

in dispute are recorded, as they are here, we do not accept any facts that are '*blatantly* contradicted by the record.'"[17]

## IV

The Winkleys claim that Blackwell's fatal shooting of Isaiah constituted an unreasonable seizure because Blackwell utilized excessive force. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement, 'through means intentionally applied.'"[18] "A seizure is unreasonable if it involves excessive force."[19] "Whether the force used is excessive depends on the facts and circumstances of each case."[20] Determining if force was excessive

> requires us to balance the individual's interest against the government's, weighing the *Graham*[21] factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[22]

---

[17] *Ambler v. Nissen*, 116 F.4th 351, 356 (5th Cir. 2024) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)), *cert. denied*, ____ S. Ct. ____, 2025 WL 1287084 (May 5, 2025).

[18] *Brendlin v. California*, 551 U.S. 249, 254 (2007) (emphasis omitted) (first quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991); and then quoting *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989)).

[19] *Baker v. Coburn*, 68 F.4th 240, 247 (5th Cir. 2023).

[20] *Id.*

[21] *Graham v. Connor*, 490 U.S. 386 (1989).

[22] *Baker*, 68 F.4th at 247 (second alteration in original) (quoting *Graham*, 490 U.S. at 396).

No. 24-60244

"Courts will consider 'not only the need for force, but also the relationship between the need and the amount of force used.'"[23]  "[T]he use of force should be proportional to the threat" as perceived by a reasonable officer.[24] "[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."[25]

Regarding deadly force in particular, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to [seize him] by using deadly force."[26]  However, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."[27]  "Even when a suspect is armed, a warning must be given, when feasible, before the use of deadly force."[28]  "[I]f the officer could reasonably use less than deadly force, he must."[29]

In evaluating the reasonableness of an officer's use of force, "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force."[30]

_____

[23] *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023) (quoting *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021)).

[24] *Id.*

[25] *Baker*, 68 F.4th at 250 (quoting *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009)).

[26] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

[27] *Id.*

[28] *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021).

[29] *Allen*, 65 F.4th at 745.

[30] *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (quoting *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996)).

11

Moreover, "the reasonableness is 'judged from the perspective of a reasonable officer on the scene,' instead of the '20/20 vision of hindsight.'"[31] In other words, "[w]e only consider the facts 'knowable to the defendant officer[]' at the time the officer[] used force, and we must be 'careful to avoid "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."'"[32] Ultimately, we conclude that genuine disputes of material fact exist regarding the second *Graham* factor.

In addressing the second *Graham* factor, "whether the suspect poses an immediate threat to the safety of the officers or others,"[33] we first identify the factual disputes noted by the district court. The district court made several observations in reaching its conclusion that "there exist material questions of fact whether Officer Blackwell faced an immediate threat of death or bodily injury at the time he applied deadly force":

> [Isaiah] was clearly having a mental or emotional health crisis. However, he never directed verbal threats toward the officers; instead, he begged the officers to shoot him. In addition, much of the testimony and many of the assertions made in support of the qualified immunity motion appear to be inconsistent with the body camera video and audio footage. A reasonable officer at the scene could have viewed [Isaiah]'s actions as nonthreatening because [Isaiah] did not touch his waistband and he could not have grabbed an additional weapon while his hands were grasping other objects—a post in one hand and a container of mentos candy in the other. The body camera

---

[31] *Allen*, 65 F.4th at 744 (quoting *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021)).

[32] *Roque*, 993 F.3d at 333 (quoting *Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019)).

[33] *Baker v. Coburn*, 68 F.4th 240, 247 (5th Cir. 2023) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

video tends to support[] the assertions made by Plaintiffs that a reasonable officer at the scene could have observed that [Isaiah] was not lifting the T-post or attempting to use it in a threatening manner. In fact, contrary to Blackwell's assertions in summary judgment pleadings, none of the videos from the incident appear to show [Isaiah] raising the T-post over his head or in any other threatening manner. At no time does it appear that [Isaiah] was advancing toward Blackwell or anyone else just before Blackwell discharged his firearm. Therefore, the video is ambiguous as to whether [Isaiah] posed a threat in the moments before he was shot.

According to Blackwell, right before he shot Isaiah, Isaiah "made a quick movement to his right with that T-post, his left hand dropped down towards the waistband of his pants and the bottom of the T-post came up," at which point Isaiah "made a threat with that T-post" while screaming "Shoot me!" The Winkleys, on the other hand, contend that right before the shooting, Isaiah "complie[d] with the officers' demands" by "mov[ing] his left foot slightly backward and begin[ning] to gently lean the T-post against the fence to his right." The Winkleys view the video as showing that "[t]he end of the T-post *never* leaves the ground, Isaiah never attempts to grasp it with two hands and [his] left foot *never* moves forward in a swinging or throwing position."

Reviewing the video for genuineness, we agree with the district court's assessment that "none of the videos from the incident appear to show [Isaiah] raising the T-post over his head or in any other threatening manner," thereby disputing Blackwell's version of events. Though the T-post was largely obscured by a fence post in the moments before Blackwell shot Isaiah, the fence post and the T-post were nearly the same height, and the top of the T-post was never visible over the top of the fence post, suggesting that Isaiah was not raising the post. The fact that the top and bottom of the T-post remained obscured by the vertical fence post also suggests that Isaiah did not

point it forward or backward at the deputies.  Finally, Isaiah's uncrossing his arms and bringing the T-post toward the fence post to his right conceivably support the Winkleys' theory that he was about to lean it against the fence and release it before he was shot.  Even though the T-post remained in his hand as he fell to the ground after being shot, viewing the evidence in the light most favorable to the Winkleys, his continued hold on the T-post may have been due to the fact that he did not have time to fully release his grip before Blackwell shot him.  The Winkleys' version of events is not "utterly discredited" by the video,[34] and we must agree with the district court that the factual disputes regarding Isaiah's use of the T-post in the moments before the shooting are genuine.

Concerning the movement of Isaiah's left hand, the Winkleys dispute that he was reaching toward his waistband and instead describe his left hand as "falling toward the ground below his waist with a hand full of something, while his head and shoulders begin looking away."  Reviewing the video for genuineness, we again agree with the district court that it is not clear that the video blatantly contradicts the Winkleys' construction of the events.  Just before the shooting, Isaiah uncrossed his arms and lowered his left hand so that it was dangling by his side, and Blackwell did not start shooting until after Isaiah's hand had come to rest by his side.  Additionally, as the district court observed, Isaiah did not touch his waistband, and because he was not wearing a shirt, it was evident throughout the encounter that nothing was protruding from his waistband that he might have grabbed to use as a weapon.

Blackwell argues that "an officer's use of deadly force has been repeatedly deemed reasonable when the 'suspect reached toward his waist in such a way that the officer perceived "to be consistent with a suspect

_____

[34] *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

retrieving a weapon"'" and that "[t]he same holds true where the suspect is shirtless when making the sudden movement."[35]  However, the case that Blackwell cites for the latter contention, *Collie v. Barron*,[36] does not support this argument about reaching for a waistband while shirtless.  Rather, in that case, the court granted a police officer qualified immunity after a shirtless suspect who initially had his hands in his pockets "removed his hand from his pocket and swung it upward and over in the direction of [another officer]," causing the defendant officer to think "he saw the glint of a gun," following which he fired two shots at the suspect.[37]  Whereas the contents of a shirtless suspect's pockets are unknowable to an officer in the moment, the vacancy of Isaiah's waistband would have been evident to Blackwell at the time of the shooting.  *Salazar-Limon v. City of Houston*[38] likewise does not support Blackwell's argument, as the suspect in that case was wearing a shirt; it was merely untucked, obscuring his waistband.[39]  We must construe the video in the light most favorable to the Winkleys, from which a jury could deem it objectively unreasonable for an officer to believe that Isaiah was reaching for a weapon in his waistband when his hand passed his waistband without touching it, his hand came to rest below his waistband, and his waistband was clearly visible with nothing protruding from it.

---

[35] *See Valencia v. Davis*, 836 F. App'x 292, 299 (5th Cir. 2020) (per curiam) (quoting *Salazar-Limon v. City of Houston*, 826 F.3d 272, 275 (5th Cir. 2016)); *Blanchard-Daigle v. Geers*, 802 F. App'x 113, 120 (5th Cir. 2020) (per curiam); *Collie v. Barron*, 747 F. App'x 950, 951-53 (5th Cir. 2018) (per curiam) (citing *Salazar-Limon*, 826 F.3d at 278-79).

[36] 747 F. App'x 950 (5th Cir. 2018) (per curiam).

[37] *Id.* at 951.

[38] 826 F.3d 272 (5th Cir. 2016).

[39] *Id.* at 275.

Moreover, Blackwell was aware during the encounter that Isaiah was holding another item in his left hand, which Isaiah never dropped. A jury might therefore doubt whether it was reasonable for Blackwell to worry that Isaiah was about to grab a weapon because Blackwell knew that Isaiah's hand was already occupied. Therefore, as with the T-post, the record does not "blatantly contradict" the Winkleys' version of events regarding Isaiah's left-hand movement,[40] and we must agree with the district court that the factual disputes on that point are also genuine.

The question then becomes whether these genuine factual disputes are material. Viewing the facts in the light most favorable to the Winkleys, as we must at this stage, a reasonable jury could determine that Isaiah was attempting to comply with the officers' commands by releasing the T-post and was merely dangling his left hand by his side in the moments leading up to Blackwell's fatal shots. Under that viewing, a reasonable jury could conclude that Isaiah "posed little or no threat to [Blackwell] or others" at that point in the encounter.[41] Given that the Supreme Court has held that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so,"[42] the possibility that Isaiah may have posed little or no threat to the officers or anyone else in the moments leading up to the shooting is highly relevant. Therefore, we conclude that "[t]he fact issues identified by the district court in this context were [] material to [the

---

[40] *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

[41] *See Ambler v. Nissen*, 116 F.4th 351, 358-59 (5th Cir. 2024) (determining that the district court's identified genuine disputes of fact were not blatantly contradicted by video evidence, so a reasonable jury could conclude the suspect posed little or no threat during his arrest and thus the fact issues were material to the Fourth Amendment claim), *cert. denied*, ___ S. Ct. ___, 2025 WL 1287084 (May 5, 2025).

[42] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

No. 24-60244

Winkleys'] Fourth Amendment claim," and "we lack jurisdiction to consider anything more."[43]

## V

Lastly, we consider whether the constitutional right that Blackwell is alleged to have violated was clearly established.[44] "[A] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[45] "The critical question when ascertaining the clearly established law is 'whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional.'"[46] To prove that a right was clearly established, a plaintiff "must 'identify a case—usually, a body of relevant case law—in which an officer acting under similar circumstances was held to have violated the Constitution.'"[47] Though "there need not be 'a case directly on point,' the unlawfulness of the challenged conduct must be 'beyond debate.'"[48] The Supreme Court has further directed that clearly established law "should not be defined 'at a high level of generality'"; rather

---

[43] *Ambler*, 116 F.4th at 358-59.

[44] *See Baker v. Coburn*, 68 F.4th 240, 245 (5th Cir. 2023).

[45] *Melton v. Phillips*, 875 F.3d 256, 265 (5th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

[46] *Roque v. Harvel*, 993 F.3d 325, 334 (5th Cir. 2021) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).

[47] *Id.* (quoting *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020)).

[48] *Joseph*, 981 F.3d at 330 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)).

it "must be 'particularized' to the facts of the case."[49]  However, "'in an obvious case,' general standards 'can "clearly establish" the answer, even without a body of relevant case law.'"[50]

We agree with the district court that Isaiah's constitutional right was clearly established by a precedential decision published by this court seventeen years before the events underlying this case, *Meadours v. Ermel*.[51] In *Meadours*, this court upheld a denial of qualified immunity on summary judgment because material factual disputes existed regarding whether a man suffering mental health problems posed an imminent threat to officers when he refused to drop a potential weapon despite their repeated commands to do so.[52]  The sister of the eventual shooting victim in that case called 911 to request mental health assistance for her brother because he had been having an ongoing "mental episode" for about one week.[53]  "In her call [the sister] made it clear she was seeking mental health assistance for her brother and not reporting a crime," but she "inform[ed] the dispatcher that [her brother] had 'flipped out' and she did not know what he was going to do."[54]

When officers arrived on the scene, they found the brother "holding a large screwdriver, later identified as being 10 3/4 inches long."[55]  "The

---

[49] *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (first quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); and then quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[50] *Roque*, 993 F.3d at 336 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

[51] 483 F.3d 417 (5th Cir. 2007).

[52] *Id.* at 419-21, 423.

[53] *Id.* at 419.

[54] *Id.*

[55] *Id.* at 420.

officers claim[ed] they repeatedly commanded [the brother] to drop the screwdriver" but he "refused."[56] After a fourth officer arrived on the scene, the brother "became increasingly aggressive," and the officers claimed that "based on [his] behavior, they felt that [he] was a threat to himself and others, and that the officers could not simply leave or allow [him] to leave."[57]

He again "refused to drop his weapon," so the fourth officer "fired one beanbag round that struck [the brother] in the upper thigh area."[58] "In response, [the brother] ran and jumped over a fence into a dog pen and climbed atop a doghouse, retaining possession of the screwdriver."[59] Three of the officers followed him into the pen and "again ordered [him] to drop his weapon, and he again refused."[60] The fourth officer then "shot [the brother] with a second beanbag round, but [he] remained atop the doghouse with the screwdriver."[61] At this point, the fourth officer claimed that he "fired a third beanbag round that . . . knocked [the brother] off the doghouse," though the plaintiffs "claim[ed] that it was [a] bullet, not a beanbag round, that knocked [him] from the doghouse."[62]

"After falling/jumping from the doghouse, [the brother] began to run toward a door leading to the garage with the screwdriver held in what the officers describe as a 'stabbing grip.'"[63] The officers claimed that one officer

_____

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.* at 420-21.

"was standing near that door and they felt that [the brother] was charging at [that officer] with the screwdriver," so "[r]esponding to the perceived threat, [three officers] stated they repeatedly fired their service weapons, each a different caliber, killing [the brother]."[64]

The brother's estate, his parents, and his sister then sued the officers, alleging that their excessive force violated the brother's constitutional rights.[65] The officers asserted a qualified immunity defense at summary judgment, and this court reasoned on appeal that "[i]n order to determine reasonableness in the case at bar, several key factual disputes must be resolved—for example, whether [the brother] was first shot while charging at [an officer] or while he was still atop the doghouse, posing no imminent threat."[66] Due to "the necessity to determine these types of facts," we held that "this dispute is material to the outcome of the case and the officers are not entitled to summary judgment."[67]

To be sure, as Blackwell notes, differences exist between *Meadours* and Blackwell's shooting of Isaiah. For one, the police in *Meadours* were responding to a call for mental health assistance rather than a report of a crime, whereas Wascom had reported Isaiah as a burglary suspect. However, the circumstances of Isaiah's alleged burglary, particularly the unoccupied status of the home and the lack of threats or physical violence, weigh against using deadly force, so this difference is not significant enough to outweigh the many similarities between the two cases.

_____

[64] *Id.* at 421.

[65] *Id.* at 419.

[66] *Id.* at 421, 423.

[67] *Id.* at 423.

Additionally, Isaiah was holding a six foot T-post, while the brother's potential weapon in *Meadours* was a screwdriver of only ten and three quarters inches in length. However, in both cases, the officers described the objects as weapons, repeatedly ordered the eventual shooting victims to drop them, and viewed escalating force as necessary when they refused to do so. These similarities suggest that the officers in *Meadours* viewed the screwdriver as no less threatening than Blackwell viewed the T-post. Moreover, because Blackwell stood approximately eight feet from Isaiah when he shot him, a reasonable jury could determine that he was beyond the range of endangerment from the T-post at that moment, just as the officers in *Meadours* were potentially out of range of the screwdriver, so this difference again does not outweigh the similarities in the cases.

Lastly, Blackwell argues that *Meadours* "did not involve" any "sudden movements with his hand toward his waistband and movement of his feet," unlike Blackwell's version of the facts in this case. However, as discussed above, the video evidence does not blatantly contradict the Winkleys' claim that Isaiah was not advancing toward Blackwell in the moments leading up to the shooting and that he was merely lowering his hand rather than reaching for his waistband. Therefore, these alleged differences also do not sufficiently distinguish these cases, at least at the summary judgment stage.

Many significant similarities exist between the cases. In *Meadours*, the sister called 911 because her brother had been experiencing an ongoing "mental episode" and had "flipped out." The brother also "became increasingly aggressive" in the encounter with the officers, leading them to believe that his mental health status rendered him a threat to himself and others. Similarly, the district court here determined that Isaiah was "clearly having a mental or emotional health crisis" based on his pleas to the officers to shoot him. The 911 dispatcher also warned the officers in advance that

Isaiah did not "look in his right state of mind," another sign of mental instability. Throughout the encounter in *Meadours*, the brother was holding a large screwdriver that the police described as a "weapon." Here, Isaiah was holding a T-post during the encounter that the officers also viewed as a potential weapon. In *Meadours*, the officers repeatedly ordered the brother to drop the screwdriver, but he did not do so. Here, the narrative differs slightly, but in a way that favors Isaiah: the officers also repeatedly ordered Isaiah to drop the T-post, and though he did not comply initially, he disputedly attempted to comply in the moments before Blackwell shot him, as described above. In *Meadours*, the officers attempted to use non-deadly force—a beanbag shotgun—at least twice before resorting to deadly force in order to force the brother to comply with their orders. Here, Sholar deployed nondeadly force—his taser—twice unsuccessfully to bring down Isaiah before Blackwell resorted to deadly force, gunshots to Isaiah's chest.

Finally, in *Meadours*, this court upheld the denial of qualified immunity because the facts disputedly suggested that the officers shot the brother with a bullet while he stood atop the doghouse "posing no imminent threat" even though he was still gripping his potential weapon, the screwdriver. Similarly, a reasonable jury could view the videos here as showing that Blackwell shot Isaiah when he posed no imminent threat because he was arguably dangling his left hand by his side, making no threatening gestures with the T-post, and potentially attempting to release the T-post. Based on these similarities, *Meadours* placed Blackwell on notice that he would not be entitled to qualified immunity when he used deadly force on someone showing signs of mental instability who posed no imminent threat to Blackwell or others, even if the shooting victim was holding a potential weapon and multiple attempts to use nondeadly force were unsuccessful.

Blackwell argues that this case is factually analogous to *Kisela v. Hughes*,[68] in which the Supreme Court reversed the Ninth Circuit's denial of qualified immunity.[69]  Blackwell asserts that the similarities between the cases clearly establish the reasonableness of his conduct.  While it is true that the two cases share some factual similarities, Blackwell misconstrues *Kisela*'s holding.  In *Kisela*, police officers responded to reports that a woman who had been "acting erratically" was "hacking a tree with a kitchen knife."[70]  When the officers arrived, they watched through a chain-link fence as a woman "match[ing] the description of the woman who had been seen hacking a tree" proceeded to "walk[] toward [a second woman] and stop[] no more than six feet from her" while holding a large knife.[71]  The officers told the woman with the knife to drop it at least twice, and though the woman "appeared calm," she "did not acknowledge the officers' presence or drop the knife."[72]  One officer then "shot [the woman with the knife] four times through the fence."[73]

The Court framed the question in the case as "whether at the time of the shooting [the officer's] actions violated clearly established law."[74]  In reviewing the Ninth Circuit's reversal of the district court's award of qualified immunity, the Supreme Court stated that it "need not, and does not, decide whether [the officer] violated the Fourth Amendment when he

---

[68] 584 U.S. 100 (2018) (per curiam).

[69] *Id.* at 102, 108.

[70] *Kisela*, 584 U.S. at 101.

[71] *Id.*

[72] *Id.* at 101-02.

[73] *Id.* at 102.

[74] *Id.* at 101.

No. 24-60244

used deadly force" because "even assuming a Fourth Amendment violation occurred—a proposition that is not at all evident—on these facts [the officer] was at least entitled to qualified immunity."[75]  The Court went onto explain that the officer was entitled to qualified immunity because the case was "far from an obvious case in which any competent officer would have known that shooting [the woman with the knife] to protect [the second woman] would violate the Fourth Amendment," and "the most analogous Circuit precedent favor[ed] [the officer]."[76]  Therefore, the Court concluded that the constitutional right was not clearly established and reversed the Ninth Circuit's decision denying qualified immunity.[77]  The inquiry in *Kisela* differs from that before us.

* * *

Because we agree with the district court that genuine disputes of material fact raise questions as to whether Isaiah posed an immediate threat when Blackwell fatally shot him, we AFFIRM and REMAND the case for further proceedings.

---

[75] *Id.* at 103-04.

[76] *Id.* at 105-06.

[77] *Id.* at 108.